**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | No. 23-cr-371 (CJN) |
| **ROMERO CABRAL DA COSTA NETO,** | |
| **Defendant.** | |

**DEFENDANT ROMERO CABRAL DA COSTA NETO'S**
**<u>SENTENCING MEMORANDUM</u>**

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ............................................................................................................... 1

II.     LEGAL STANDARD......................................................................................................... 2

        A.      The History and Characteristics of the Defendant ................................................ 3

                1.      Personal Background and Early Education............................................... 3

                2.      Higher Education and Brazilian Professional Background ...................... 5

                3.      Mr. Costa's Personal and Family Life ..................................................... 7

                4.      Mr. Costa's Move to the United States in 2022....................................... 8

        B.      The Nature and Circumstances of the Offense ...................................................... 9

        C.      The Advisory Guidelines Calculation.................................................................. 10

                1.      Acceptance of Responsibility ................................................................. 11

                2.      The Order of Adjustments in the Guidelines Calculation....................... 12

                3.      Guidelines Presumption that a Sentence that Does Not Include a
                        Term of Imprisonment is Appropriate ................................................... 12

        D.      The Purpose of Sentencing .................................................................................. 13

                1.      Mr. Costa Has Already Been Significantly Punished and Does Not
                        Pose a Risk of Recidivism ..................................................................... 13

                2.      General Deterrence Is Achieved with a Sentence of Non-
                        Incarceration ......................................................................................... 15

        E.      Rehabilitation in this Case Will Be Best Served by Mr. Costa Returning to
                Brazil.................................................................................................................... 17

        F.      The Need to Avoid Unwarranted Disparities Among Similar Offenders............. 17

III.    PROBATION'S RECOMMENDATION OF A TWO-MONTH PRISON
        SENTENCE IS UNWARRANTED IN THIS CIRCUMSTANCE.................................. 21

VI.     CONCLUSION................................................................................................................ 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*SEC v. Costa*,
 No. 23-cv-2451 (D.D.C.) .......................................................................................11

*Tapia v. United States*,
 564 U.S. 319 (2011) ........................................................................................... 13

*United States v. Anderson*,
 No. 06-cr-91 (N.D. Ga.) ...................................................................................... 20

*United States v. Booker*,
 543 U.S. 220 (2005) ............................................................................................. 2

*United States v. Catenacci*,
 No. 21-cr-759 (N.D. Ill.) ...................................................................................... 20

*United States v. Collins*,
 No. 18-cr-567 (S.D.N.Y.) ..................................................................................... 20

*United States v. Estrella*,
 203 F.3d 53 (D.C. Cir. 1999)................................................................................ 25

*United States v. Ettu*,
 No. 18-cr-490 (E.D. Pa.) ...................................................................................... 20

*United States v. Frazier*,
 2013 WL 499245 (D.N.M. Feb. 4, 2013).............................................................. 15

*United States v. Gallant*,
 306 F.3d 1181 (1st Cir. 2002)............................................................................... 23

*United States v. Gardellini*,
 545 F.3d 1089 (D.C. Cir. 2008)............................................................................ 24

*United States v. Hoffmann*,
 2006 WL 3390736 (D. Neb. Nov. 22, 2006), *aff'd, 556* F.3d 871 (8th Cir. 2009).................... 15

*United States v. Levoff*,
 No. 19-cr-780 (D.N.J. Aug. 12, 2020).................................................................. 18

*United States v. Merise*,
 2022 WL 355207 (D.D.C. Feb. 7, 2022) ............................................................... 25

*United States v. Miller,*
   116 F.3d 641 (2d Cir. 1997) ........................................................................ 23

*United States v. Otunyo,*
   63 F.4th 948 (D.C. Cir. 2023) .................................................................... 24

*United States v. Powers*,
   No. 19-cr-57 (M.D. Fla.) ............................................................................ 19

*United States v. Rodriguez*,
   676 F.3d 183 (D.C. Cir. 2012) .................................................................. 25

*United States v. Saltsman*,
   Case No. 07-cr-641 (E.D.N.Y.) .................................................................. 24

*United States v. Schulman*,
   No. 16-cr-442 (E.D.N.Y.) .......................................................................... 18

*United States v. Simalavong*,
   924 F. Supp. 610 (D. Vt. 1995) ......................................................... 22, 23

*United States v. Smith*,
   27 F.3d 649 (D.C. Cir. 1994) .................................................................... 21

*United States v. Stephenson*,
   950 F. Supp. 2d 1 (D.D.C. 2013) ............................................................. 25

*United States v. Williams*,
   773 F.3d 98 (D.C. Cir. 2014) ...................................................................... 2

**Regulations**

18 U.S.C. § 3551(a) ............................................................................................ 13

18 U.S.C. § 3553(a) ........................................................................ 2, 3, 13, 14, 17

18 U.S.C. § 3563(b)(1) ...................................................................................... 17

18 U.S.C. § 3563(b)(4) ...................................................................................... 17

18 U.S.C. § 3624(c) ........................................................................................... 25

**Statutes**

U.S.S.G. § 3E1.1 ...........................................................................................11, 12

U.S.S.G. § 4C1.1 ................................................................................................ 12

U.S.S.G. § 5C1.1 ....................................................................................... 1, 3, 12, 22

iii

**Regulations**

88 Fed. Reg. 28254 (May 3, 2023) ................................................................ 15

**Other Authorities**

"Attorney Arrested on Charges of Insider Trading", (Aug. 23, 2023) .......................................... 16

"Ex-Attorney at Gibson Dunn Charged With Insider Trading," LAW.COM (Aug. 23, 2023)........ 16

"Visiting Brazilian Attorney Pleads Guilty to Insider Trading," (Nov. 1, 2023) ......................... 16

Andrews Goudsward, "Former Gibson Dunn visiting lawyer charged with insider trading
    on pharma deal," REUTERS (Aug. 23, 2023) ............................................................... 16

Federal Bureau of Prisons Program Statement 5100.08: Inmate Security Designation and
    Custody Classification, CN-1, Ch. 5-12 (Sept. 12, 2006) ................................. 23, 25

Federal Bureau of Prisons Program Statement 7310.04: Community Corrections Center
    (CCC) Utilization and Transfer Procedures (Dec. 16, 1998) .................................... 23

Federal Bureau of Prisons Program Statement 7320.01: Home Confinement, CN-2 (Aug.
    1, 2016)........................................................................................................ 24

Jessica Corso, "Ex-Gibson Dunn Visiting Atty Charged With Insider Trading," LAW360
    (Aug. 23, 2023) ...................................................................................................... 16

Sabrina Willmer, "Ex-Gibson Dunn Attorney Pleads Guilty to Insider Trading Charge,"
    BLOOMBERG Law (Nov. 1, 2023) .................................................................... 16

Tony Aarons, Former Gibson Dunn Attorney Charged With Insider Trading, BLOOMBERG
    (Aug. 23, 2023) ...................................................................................................... 16

Viviane M. Prado, Enforcing Insider Trading Law: The Brazilian Experience,
    38 Miss. C. L. Rev. 93 (2020) ................................................................................. 10

I.      **INTRODUCTION**

Defendant Romero Cabral da Costa Neto ("Mr. Costa") stands before this Court to receive his sentence, having pled guilty to one count of insider trading as part of a plea agreement with the government.  Mr. Costa has admitted to financial misconduct and a breach of the trust of his former law firm and its clients.  Nevertheless, these events are a major aberration in what has otherwise been an exemplary life.  He is a wonderful father to his 2-year-old daughter, a devoted husband, a trusted son and brother, and until his actions at issue in this case put his career in jeopardy, a hard-working and successful young lawyer who had never received a complaint about his conduct.

In fashioning its sentence, Mr. Costa respectfully requests that the Court consider the following key points.  First, all parties agree that Mr. Costa should have an Offense Level of 11 under the U.S. Sentencing Guidelines, which places him in Zone B of the Sentencing Table under U.S.S.G. § 5A.  Pursuant to the 2023 Sentencing Guidelines Amendments, because he is a "Zero-Point Offender" in Zone B there is a presumption under U.S.S.G. § 5C1.1 that a "sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment" is "generally appropriate."

Second, Mr. Costa has already paid a steep price for his actions.  Because the government initially sought his pre-trial detention as a risk of flight, upon his arrest he spent seven days in the D.C. Jail.  Since his release approximately four months ago in August 2023, he has been restricted to home detention with GPS monitoring.  More significant is the substantial hardship and embarrassment Mr. Costa has caused his family.  Mr. Costa is a 33-year-old Brazilian lawyer and was living in the United States with his wife and young daughter on a temporary work visa solely for a one-year visiting foreign attorney position at a prominent U.S. law firm.  The government charged him by complaint shortly before that position (and his temporary work visa) was scheduled

1

to end in September 2023.  For the last several months, his wife and young daughter have been living in Brazil, separated from Mr. Costa and unable to return to be with him in the United States due to their visa applications being denied.  Mr. Costa has not seen his daughter since before the date of his arrest four months ago.  Further, both the U.S. law firm he was visiting and his law firm in Brazil have terminated his employment, and his actions have placed his future legal career in jeopardy.  Meanwhile, he is depleting his savings supporting his family in Brazil while he remains in the United States pending the resolution of his case, unable to work due to his visa having lapsed.

Third, Mr. Costa is very remorseful and ashamed of his actions.  He fully recognizes the gravity of his breach of his professional duties, and the resulting unfair advantage he profited from in the securities markets.  He takes full responsibility for his actions and seeks the Court's understanding and leniency so that he may reunite with his wife and daughter and begin the arduous process of rebuilding his shattered life and becoming a productive citizen once more.  To facilitate that rehabilitative process, he respectfully requests a sentence of time served with a term of supervised release that is suspended upon his voluntary departure from the United States following his sentencing hearing.

## II.   <u>LEGAL STANDARD</u>

This Court should determine Mr. Costa's sentence in accordance with the factors delineated in 18 U.S.C. § 3553(a) and the remedial scheme set forth in *United States v. Booker*, 543 U.S. 220 (2005).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  But the court must then consider the arguments of the parties and the seven sentencing factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence, including whether a variance from the advisory Guidelines range is warranted."  *United States v. Williams*, 773 F.3d 98, 108 (D.C. Cir. 2014).

Pursuant to the Presentence Investigation Report ("PSR"), Mr. Costa's Offense Level is 11, placing him within Zone B of the Sentencing Table under U.S.S.G. § 5A. Although the advisory Sentencing Guidelines range is 8 to 14 months of imprisonment, as noted because he is a "Zero-Point Offender" in Zone B, there is a presumption that a sentence of probation with conditions of confinement is "generally appropriate." PSR ¶ 111 (citing U.S.S.G. § 5C1.1, n.10). Given that presumption, the section 3553(a) factors weigh strongly in favor of a sentence of time served with a term of suspended supervised release so that Mr. Costa can return to Brazil and begin the process of rebuilding his life while supporting his young family. As it must, this sentence takes into account the punishment Mr. Costa has experienced to date, the fact that he is a Brazilian lawyer with a deep network of familial support in his home country (and strong obligations there to support his wife and daughter), the types of sentences imposed on similarly situated first-time offenders, and is "sufficient but not greater than necessary" to effectuate the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## A.    The History and Characteristics of the Defendant

### 1.    Personal Background and Early Education

Romero Costa was born in Brazil in 1990 and is the oldest of three children. *See* PSR ¶¶ 57, 58. His father is a business executive, and his mother worked at home raising Mr. Costa and his siblings before later obtaining her law license. *See id*. ¶¶ 57, 59. His family lived in Pernambuco, a state in northeastern Brazil known for its economic challenges and underdevelopment.

Mr. Costa comes from a very close and supportive family. As one example, when Mr. Costa's brother was young he experienced a severe case of appendicitis that Brazilian doctors initially refused to operate on due to its complexity. *See id.* ¶ 62. His parents, determined to secure the best care for their son, bore significant expenses for him to travel to Boston Children's Hospital

3

in the United States—where he was successfully treated.  *See id.*  Mr. Costa remains close with

each of his siblings.

As evidenced in the many letters his family submitted on his behalf, from childhood Mr.

Costa has been an exemplary, upstanding person—honest, hard-working, and dependable in

school, work, and his personal relationships.  His brother wrote:

> It was a big surprise for me when I learned about Romero's situation in the U.S.
> because he had always been very upright in his actions since childhood.  I always
> considered him an example because he was very diligent in school, unlike me, who
> didn't enjoy studying as much as he did and sometimes ended up needing to catch
> up at the end of the year.  In those situations, he always helped me study so I
> wouldn't fail the grade.

Ex. 1 (Letter from Marcelo Costa).[1]  Likewise, Mr. Costa's cousin stated:

> I want to start by emphasizing that Romero is, at his core, a person of good character
> with a big heart.  Growing up with him in our hometown of Recife, Brazil, I have
> been privileged to witness his kindness, integrity, and dedication to his family and
> friends.

Ex. 2 (Letter from Isabela Costa).  His father similarly explained:

> Throughout his life, Romero has been an honest person.  From his teenage years,
> he never hesitated to share the truth.  Sometimes even waking me at night to inform
> any incidents.  He has been a supportive older brother … displaying patience and
> friendliness.

Ex. 3 (Letter from Flavio Costa).  And Mr. Costa's sister wrote:

> [E]ven though Romero moved to Rio de Janeiro when I was only 10 years old, it
> never separated us because he always came to spend holidays with us in
> Pernambuco.  He has always been a great brother to me and Marcelo…

Ex. 4 (Letter from Maria Costa).

---

[1] Many of Mr. Costa's family members and others have submitted letters of support on his behalf.
The eight letters specifically cited in this Sentencing Memorandum are attached as Exhibits 1–8.
The remaining letters are included together in Exhibit 9.

Although Mr. Costa's family enjoyed a comfortable lifestyle by Brazilian standards, his parents instilled in him the values of hard work and the importance of building his own life and career. During his early years, Mr. Costa attended two different schools in Pernambuco. At the age of fifteen, he embarked on a formative journey to Canada, spending a semester there as an exchange student to enhance his English proficiency. *See* PSR ¶ 60. By age sixteen, Mr. Costa's goal was to become a corporate lawyer and the best opportunities were in São Paulo or Rio de Janeiro, the most economically developed states in Brazil. Because his mother's family had roots in Rio de Janeiro, Mr. Costa made the significant decision to relocate there at the age of seventeen to complete his final year of high school and prepare for law school.[2] *See id.* ¶¶ 59-60.

### 2.  Higher Education and Brazilian Professional Background

Mr. Costa worked hard and dedicated himself to building a successful career as an attorney. He started law school in 2008, which typically lasts five years in Brazil, at the Pontifícia Universidade Católica in Rio de Janeiro, which is known for its expertise in corporate law. *See id.* ¶ 85. In 2011, Mr. Costa secured a trainee opportunity at Pinheiro Neto Advogados ("Pinheiro Neto"), a prominent Brazilian firm. Over the course of 2011 and 2012, he diligently pursued his law school diploma, passed the bar exam, and secured a full-time position at Pinheiro Neto as a junior associate.[3] *See id.* ¶¶ 85, 87, 92. In 2013, Mr. Costa began an MBA program at the Instituto Brasileiro De Mercado De Capitais (Brazilian Institute of Capital Markets). *See id.* ¶ 86. While working full-time, he attended weekend classes for two years and completed his MBA in 2015. *See id.*

---

[2] In Brazil, it is less common than in the United States for college students to live apart from their parents.

[3] Unlike the United States, Brazilian law firms do not typically hire summer associates. Instead, law students looking for practical experience often balance work and study during their later years of law school.

In his role as a junior corporate associate at Pinheiro Neto, Mr. Costa provided counsel to a wide variety of Brazilian and international companies, financial institutions, and investors.  He advised on mergers and acquisitions, private equity investments, investment vehicle structuring, and financing.  Mr. Costa also led teams conducting due diligence and risk assessments for M&A transactions and provided regulatory guidance to clients across a number of industries.

As in his personal life, Mr. Costa was a model work colleague in Brazil, and his co-workers depended on him both in and outside of the office.  As described by one of his former supervisors at Pinheiro Neto:

> I have known Romero since 2011, when he started working as a trainee in my group at the law firm where I am a partner.  During the approximately five years that Romero worked under my direct supervision (up to 2016, when he moved firms), we developed an excellent friendship and camaraderie.  Since that time, Romero has been a loyal friend and has offered his support to me and my family when I suffered a severe accident in 2013 and later – after he had already left the firm for a few years – when I was ███████████████████████████████████████
> ████████████████████████████████████

Ex. 5 (Letter from Marcelo Viveiros de Moura).  He also noted that Mr. Costa "was prepared to assist colleagues and younger associates when required and whose sense of humor, intelligence and approachable manner made him a very popular member of the team.  A genuine team player."  *Id*.

Mr. Costa was also known to be honest and ethical in his legal work in Brazil.  Mr. Viveiros de Moura explained that he has:

> no indication and do not personally believe that Romero had conducted any illegal or unethical activities during the five years that he has worked under my direct supervision.  To the contrary, to the best of my knowledge, he has always conducted himself with total honesty and integrity during that period.  It is of note that during the time he worked with me, Romero has never tried to conceal his mistakes but rather has always been proactive in disclosing and trying to learn from them…

*Id.*  Similarly, Mr. Costa's family friend, a federal judge in Rio de Janeiro, wrote that after knowing

Mr. Costa for 25 years:

> His journey from a young, aspiring individual to a professional lawyer, admitted to
> the Brazilian Bar Association, has been marked by dedication and ethical conduct
> … Mr. Costa Neto has consistently demonstrated qualities of respect, intelligence,
> and commitment to his professional and personal responsibilities.  His conduct in
> Brazil's legal sector has been exemplary.

Ex. 6 (Letter from Jose Arthur Diniz Borges).

In 2016, Mr. Costa accepted an opportunity with a different firm, Mattos Filho Advogados

("Mattos Filho"), although it was a difficult decision given the strong ties he had developed at

Pinheiro Neto.  Upon joining Mattos Filho, Mr. Costa worked hard to prove himself anew.  His

dedication and commitment led to his rise through the ranks at Mattos Filho, and ultimately earned

him a visiting attorney position at a prominent law firm in Washington, D.C.

### 3.  Mr. Costa's Personal and Family Life

In 2017, Mr. Costa married Luiza Franco.  *See* PSR ¶ 66.  They met in 2011 in law school

and have been together for over 12 years.  Mr. Costa is a committed and devoted husband, as his

wife explained:

> As a husband, I have never ceased to be able to count on him.  Our relationship was
> built on respect, partnership, equity, and a lot of love.  When I questioned the choice
> of career I had made and wanted to make a change, he supported me both
> emotionally and financially so that I could pursue a new professional purpose.
> When the possibility of seeking important career opportunities abroad arose for
> him, he waited for the completion of my master's degree so that we could go
> together.

Ex. 7 (Letter from Luiza Franco Costa).

In 2021, the couple welcomed a daughter who turns two years old next week.  Following

his daughter's birth, Mr. Costa took a three-month leave of absence from work, dedicating himself

to caring for her alongside his wife.  As his wife wrote:

> As a father, a role he always dreamed of playing, he has shown great dedication from the beginning.  Passionate about our daughter, he took care of her in every way, making sure to actively participate in everything related to caring for a baby.

*Id*.  Mr. Costa's cousin echoed this:

> Beyond his professional achievements, I have also recently witnessed Romero's unwavering dedication to his role as a father and husband.  As a pediatric nurse, I was in awe of how effortlessly he could put his daughter … to sleep and the evident love he showed as a father.

Ex. 2 (Letter from Isabela Costa).

Together, Mr. Costa and his wife have also built a tight-knit extended family, complementing the many close relationships Mr. Costa already had with his relatives.  As noted in his many letters of support, their family universally thinks highly of Mr. Costa.  Despite his professional accomplishments and strong family relationships, however, through much of his adult life ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

### 4.  Mr. Costa's Move to the United States in 2022

After initially being postponed due to the global health crisis, in 2022 Mr. Costa was again presented with the opportunity to temporarily move to the United States for work.  Although they were in a new stage of their lives, with a newborn daughter and Mr. Costa's wife attempting to transition into a new career, the family decided to seize the opportunity.  *See* PSR ¶ 67.  This move in September 2022, however, ultimately marked a significant shift in Mr. Costa's career and personal life.  The family was far from their support network of family and friends in Brazil, which had been essential in helping them care for their newborn daughter.  Mr. Costa also made the

unfortunate decision to █████████████████████████████████████████████████████

████████████████████████████████████████████

In Washington D.C., Mr. Costa and his family felt isolated.  The move was particularly challenging for his wife, as Mr. Costa spent most of his weekdays at the office.  Within a few months of arriving, Mr. Costa also realized that his work expectations were significantly distorted. He worked in a much more junior capacity than he was anticipating and did not receive enough tasks to fill his work hours.  He felt guilty about moving his family to the U.S., a decision he now regretted, and hesitated to confide in his wife about the mistake he had made.

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████  In April 2023, Mr. Costa and Luiza decided it was best for Luiza and their daughter to return home to Brazil in June, ahead of Mr. Costa's planned permanent return in September 2023.  In early August 2023, Mr. Costa traveled to Brazil for a brief visit with his wife and daughter, and then returned to the United States.  Although his wife was able to return for a short visit in late August 2023 following his arrest, Mr. Costa has not seen his daughter in over four months.

### B.    The Nature and Circumstances of the Offense

As he admitted in his plea agreement, Mr. Costa is guilty of insider trading while working as a visiting attorney at his U.S. law firm.  *See* PSR ¶ 4.  He profited approximately $50,000 from placing stock trades over several months in 2023 based on information regarding the firm's clients he electronically accessed on its computer system.  *See id.* ¶¶ 16-33.  Mr. Costa made a terrible mistake in judgment for which he is exceedingly remorseful and embarrassed and is taking full responsibility.  Mr. Costa respectfully requests that the Court consider two points with respect to the nature of his offense.

First, unlike in many other insider trading cases, this was not a carefully planned criminal scheme.  Mr. Costa did not have to steal a password, hack into unauthorized files or systems, or conspire with an insider to obtain the material, non-public information.  Instead, he used his access to the firm's electronic file system to obtain the inside information, and he then made several trades based on it.  *See* PSR ¶¶ 16-33.  Mr. Costa also did not attempt to actively conceal his trading or to profit further by selling his inside information to others.  *Id*.  He traded only for himself in brokerage accounts registered in his own name.  *Id*.

Second, Mr. Costa is a Brazilian lawyer who has spent essentially his entire life in a different legal system that views insider trading much differently.  As it is here, insider trading is prohibited in Brazil; however, only on rare occasions have Brazilian defendants been sentenced to imprisonment for such conduct.  For example, one study found that between 2008 and 2018 there was only one insider trading case in Brazil that resulted in imprisonment, and even that sentence was later reduced to community service.[4]  Of course, this does not excuse his conduct.  Mr. Costa voluntarily came to the United States and is subject to its laws—but how the society in which Mr. Costa was born, raised, and practiced for years as a lawyer views the appropriate punishment for this offense provides necessary context for his actions.

### C.    The Advisory Guidelines Calculation

Mr. Costa agrees with the PSR's calculation of an Offense Level of 11 and his placement in Zone B of the Sentencing Table.  He respectfully requests that the Court consider the following points.

---

[4] *See* Viviane M. Prado, *Enforcing Insider Trading Law: The Brazilian Experience*, 38 Miss. C. L. Rev. 93, 105 (2020).

### 1. Acceptance of Responsibility

First, as noted in the PSR, Mr. Costa qualifies for the Acceptance of Responsibility adjustment under U.S.S.G. § 3E1.1.  Pursuant to the plea agreement in this case, he pleaded guilty before he was indicted—saving the government significant time and resources.  Although not expressly considered in the adjustment, Mr. Costa has also reached an agreement with the U.S. Securities and Exchange Commission ("SEC") for a judgment to be entered in the SEC's parallel civil enforcement case against him alleging substantially similar conduct.[5]

Additionally, this would have been a difficult case for the government to take to trial based on the evidence it had obtained at the time of Mr. Costa's guilty plea.  The government had no corroborating evidence of Mr. Costa's intent from his e-mail, text, or other electronic communications, nor from third-party witnesses.  The government's evidence that Mr. Costa possessed material, non-public information on which he traded was based on electronic document management logs from his U.S. law firm showing which internal client documents he accessed (and the corresponding date and time) before placing stock trades.  While the log contained the file names of the documents Mr. Costa viewed, which generally described their contents, it had only obtained a few of the underlying documents.  Although this evidence was sufficient to prove Mr. Costa's guilt, to prepare for trial the government likely would have needed to make significant efforts to obtain additional, presumptively privileged documents from Mr. Costa's U.S. law firm.  By pleading guilty, Mr. Costa spared the government the likely substantial burden of requesting (and potentially litigating to obtain) these documents on top of its usual trial preparations.

---

[5] *See SEC v. Costa*, No. 23-cv-2451 (D.D.C.) (CJN).

### 2. The Order of Adjustments in the Guidelines Calculation

Next, regarding the recent "Zero Point Offender" Guidelines Amendment, the parties agree that the Acceptance of Responsibility (U.S.S.G. § 3E1.1) adjustment should be deducted from the Offense Level before the Zero Point Offender (U.S.S.G. § 4C1.1) reduction.  This results in the 3-point Acceptance of Responsibility deduction in the Guidelines calculation here.

Under U.S.S.G. § 1B1.1, the Guidelines calculations are made in order by chapter.  In calculating the Offense Level, after applying the Chapter 2 provisions and a 2-point enhancement for Abuse of Position of Trust under U.S.S.G.§ 3B1.3, the Offense Level is a 16.  The Acceptance of Responsibility provision (U.S.S.G. § 3E1.1) then specifies that a defendant is eligible for the full 3-point reduction (rather than a 2-point reduction) if "the offense level determined prior to the operation of" the Acceptance of Responsibility provision is level 16 or greater.  U.S.S.G. § 3E1.1(b).  Since Mr. Costa's Offense Level at that point is a 16, he can receive the full 3-point reduction.  His Offense Level is then further reduced by 2 points by the Zero-Point Offender adjustment.  *See* U.S.S.G. § 4C1.1 ("If the defendant meets all of the following criteria … decrease the offense level determined under Chapters Two and Three by 2 levels.").  This results in a final Offense Level of 11.

### 3. Guidelines Presumption that a Sentence that Does Not Include a Term of Imprisonment is Appropriate

Finally, an Offense Level of 11 places Mr. Costa within Zone B of the Sentencing Table under U.S.S.G. § 5A.  Although the Guidelines have long given courts options with respect to sentencing Zone B defendants to different conditions of confinement and probation, the recent 2023 Amendments added a new presumption for "Zero-Point Offenders" like Mr. Costa: a "sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment" is

"generally appropriate."  U.S.S.G. § 5C1.1 n.10 (referencing § 5C1.1(c)(3)).  Under U.S.S.G. § 5C1.1(e), each day of intermittent confinement, community confinement, or home detention substitutes for one day of imprisonment.

### D.    The Purpose of Sentencing

The Sentencing Guidelines direct that each sentence should be determined based on the relevant facts and circumstances and designed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  As the Supreme Court has noted, "these four considerations—retribution, deterrence, incapacitation, and rehabilitation—are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes … to the extent they are applicable' in a given case.'"  *Tapia v. United States*, 564 U.S. 319, 324 (2011) (quoting 18 U.S.C. § 3551(a)).  Mr. Costa respectfully submits that a sentence of time served best fits these purposes, especially accounting for the consequences his actions have already caused him to date, his extremely low risk of recidivism, the deterrence caused by the media coverage of his case, and the relative importance of rehabilitation in these circumstances.

### 1.   Mr. Costa Has Already Been Significantly Punished and Does Not Pose a Risk of Recidivism

Mr. Costa has already been significantly punished.  Because the government initially sought his pre-trial detention as a risk of flight, following his arrest he served a week of detention in the Central Detention Facility of D.C. Jail.  Since his release approximately four months ago, he has been restricted to home detention with GPS monitoring.  Although he is incredibly grateful

for the presence of his mother and father and their willingness to upend their lives in Brazil to serve as his third-party custodians, he badly misses his wife and young daughter who remain in Brazil.  His daughter's second birthday is next week and he has not seen her for more than four months.  As Mr. Costa's wife explained: "I see that the months he is spending away from our daughter, as well as the realization of the impacts that his bad decisions are causing in her life, are the points that cause the greatest suffering and reflection amid the whole situation he is experiencing."  Ex. 7 (Letter from Luiza Franco Costa).  As evidenced by his letters of support, Mr. Costa is also very close with his extended family and has a number of good friends—none of whom live in the Washington, D.C. area.  Meanwhile, Mr. Costa is depleting his family's savings living in the U.S. while continuing to financially support his wife and daughter in Brazil.  Finally, both the U.S. law firm he was visiting and his law firm in Brazil have terminated his employment, and his actions have placed his legal career for which he has worked so hard in grave jeopardy.

Under 18 U.S.C. § 3553(a)(2), there is no doubt that these consequences sufficiently "provide just punishment" for the offense and "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(A), (C).  Suffice it to say, Mr. Costa has learned his lesson and poses essentially no risk of recidivism whatsoever, let alone a risk of committing crimes in the United States.  As a foreign national with a felony conviction and an agreed order of deportation, it is unlikely that he will even be able to return to this country.

In addition to his specific personal circumstances, empirical data confirms that true "first offenders" like Mr. Costa, with no prior convictions or arrests, exhibit an "extremely low recidivism rate."[6]  The U.S. Sentencing Commission, in fact, cited similar recidivism data as an

---

[6] "Recidivism and the 'First Offender,'" U.S. Sentencing Guidelines (May 2004) at 17, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

important factor driving the recent Guidelines Amendments for first-time offenders with no criminal history: "[r]ecidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."[7]

### 2.  General Deterrence Is Achieved with a Sentence of Non-Incarceration

Mr. Costa submits that his arrest and guilty plea have already achieved a significant deterrent effect.  Indeed, general deterrence to criminal conduct is increased when a defendant's criminal proceedings are, as here, well-publicized.  *See, e.g., United States v. Frazier*, 2013 WL 499245, at *5 (D.N.M. Feb. 4, 2013) (noting the Government's view that the defendant's guilty plea and the accompanying "publicity and public support for justice" had "already served the factor of general deterrence"); *United States v. Hoffmann*, 2006 WL 3390736, at *6 (D. Neb. Nov. 22, 2006) ("[Defendant]'s prosecution received considerable publicity in his hometown.  That publicity, along with damage to [defendant]'s reputation, will also deter others from engaging in similar criminal conduct. The mere fact of the prosecution of these individuals sends a compelling message of deterrence."), *aff'd*, 556 F.3d 871 (8th Cir. 2009).

---

publications/2004/200405_Recidivism_First_Offender.pdf (reporting a 6.8% recidivism rate for true first time offenders).
[7] 88 Fed. Reg. 28254, 28273 (May 3, 2023).

Mr. Costa's case has generated widespread publicity and has been covered by, among others, Reuters,[8] Law.com,[9] Bloomberg,[10] Bloomberg Law,[11] and Law360.[12] The U.S. Attorney's Office for the District of Columbia issued press releases both when Mr. Costa was arrested and charged[13] and when he pled guilty.[14] His case has also been widely reported in Brazil. *See* Ex. 8 (Letter from Cornelio Brennand) ("[l]eading media outlets in Brazil have widely publicized his arrest and the news went viral on social media in business circles, making his reputation irreparably damaged.").

---

[8] Andrews Goudsward, "Former Gibson Dunn visiting lawyer charged with insider trading on pharma deal," REUTERS (Aug. 23, 2023), *available at* https://www.reuters.com/legal/government/former-gibson-dunn-visiting-lawyer-charged-with-insider-trading-pharma-deal-2023-08-23/.

[9] "Ex-Attorney at Gibson Dunn Charged With Insider Trading," LAW.COM (Aug. 23, 2023), *available at* https://www.law.com/nationallawjournal/2023/08/23/ex-attorney-at-gibson-dunn-charged-with-insider-trading/?slreturn=20231113145401.

[9] Sabrina Willmer, "Ex-Gibson Dunn Attorney Pleads Guilty to Insider Trading Charge," BLOOMBERG LAW (Nov. 1, 2023), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/ex-gibson-dunn-attorney-pleads-guilty-to-insider-trading-charge.

[9] Jessica Corso, "Ex-Gibson Dunn Visiting Atty Charged With Insider Trading," LAW360 (Aug. 23, 2023), *available at* https://www.law360.com/articles/1714473/ex-gibson-dunn-visiting-atty-charged-with-insider-trading.

[10] Tony Aarons, Former Gibson Dunn Attorney Charged With Insider Trading, BLOOMBERG (Aug. 23, 2023), https://www.bloomberg.com/news/articles/2023-08-23/former-gibson-dunn-attorney-is-charged-with-insider-trading.

[11] Sabrina Willmer, "Ex-Gibson Dunn Attorney Pleads Guilty to Insider Trading Charge," BLOOMBERG LAW (Nov. 1, 2023), *available at* https://news.bloomberglaw.com/white-collar-and-criminal-law/ex-gibson-dunn-attorney-pleads-guilty-to-insider-trading-charge.

[12] Jessica Corso, "Ex-Gibson Dunn Visiting Atty Charged With Insider Trading," LAW360 (Aug. 23, 2023), *available at* https://www.law360.com/articles/1714473/ex-gibson-dunn-visiting-atty-charged-with-insider-trading; Lauren Borg, "Ex-Gibson Dunn Visiting Atty Cops To Insider Trading," LAW360 (Nov. 1, 2023), *available at* https://www.law360.com/articles/1739509/ex-gibson-dunn-visiting-atty-cops-to-insider-trading.

[13] *See* "Attorney Arrested on Charges of Insider Trading," U.S. Department of Justice (Aug. 23, 2023), *available at* https://www.justice.gov/usao-dc/pr/attorney-arrested-charges-insider-trading.

[14] *See* "Visiting Brazilian Attorney Pleads Guilty to Insider Trading," U.S. Department of Justice (Nov. 1, 2023), *available at* https://www.justice.gov/usao-dc/pr/visiting-brazilian-attorney-pleads-guilty-insider-trading.

This publicity associated with Mr. Costa's prosecution satisfies the need for general deterrence.  Lawyers in the United States and even now in Brazil are on notice, now more than ever, that trading on the confidential information their firms gain through their representation of various parties, may, at the very least, result in a felony conviction, severely and irreparably damage their reputation, and impair their ability to practice law.  Accordingly, Mr. Costa respectfully submits that imposition of a period of incarceration is not necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).

**E.     Rehabilitation in this Case Will Be Best Served by Mr. Costa Returning to Brazil**

Finally, Mr. Costa's rehabilitation would be much better served by allowing him to return home to Brazil.  Commonly imposed discretionary conditions of probation, for example, include that an individual "support his dependents and meet other family responsibilities," and that he "work conscientiously at suitable employment."  18 U.S.C. §§ 3563(b)(1), (4).  This is only possible for Mr. Costa in Brazil, not the United States.  His wife and young daughter remain in Brazil, unable to join him in the U.S., and as a non-citizen with an expired visa he has no ability to work here.  Mr. Costa is extremely motivated to make amends with his family for the harm his actions have caused them and to get his life back on track—but he can only do that at home.

**F.     The Need to Avoid Unwarranted Disparities Among Similar Offenders**

"[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), weighs heavily in favor of imposing a noncustodial sentence on Mr. Costa.  A prison sentence would be harsher than the more lenient sentences that other district courts have imposed on similarly situated lawyers convicted of trading on material, non-public information learned during their employment,

as well as on other defendants convicted of insider trading whose conduct resulted in similar or even higher profits.

To start, a custodial sentence would be inconsistent with the probationary sentences other courts have imposed on attorneys who traded on clients' material, non-public information in similar (or even greater) dollar amounts.  In *United States v. Schulman*, for example, the defendant, Robert Schulman, was a partner in the Washington, D.C. office of a national law firm.  *See United States v. Schulman*, No. 16-cr-442 (E.D.N.Y.).  Schulman was accused of informing his investment adviser that his client, King Pharmaceuticals, planned to merge with Pfizer.  *See* Indictment at 3– 4, *Schulman* (E.D.N.Y. Aug. 4, 2016), ECF No. 1.  The Government alleged that the adviser then traded King securities in his own accounts and on behalf of Schulman and other clients, and tipped off another adviser.  *See id.* at 4–6.  Ultimately, the tip Mr. Schulman provided to his investment adviser resulted in $319,000 in illicit profits, including $15,500 in profits for Mr. Schulman himself.  *See id.* at 6.  Unlike Mr. Costa, Mr. Schulman elected to go to trial, where he was convicted of conspiracy and securities fraud.  Notwithstanding the government's request for a prison term ranging from 51 to 64 months, *see* Sentencing Memorandum at 5, 14, *Schulman* (E.D.N.Y. Sept. 18, 2017), ECF No. 145, the district court sentenced Schulman to three years of probation, *see* Judgment at 2, *Schulman* (E.D.N.Y. Oct. 4, 2017), ECF No. 153.

As another example, just in the past two weeks a district court in New Jersey sentenced Gene Levoff, an attorney who previously served as Apple's global head of corporate law and corporate secretary, to probation for a more egregious and profitable insider trading scheme.  *See United States v. Levoff*, No. 19-cr-780 (D.N.J.).  Levoff was on a committee of senior executives who reviewed Apple's draft earnings materials prior to their public dissemination each quarter.  *See* Indictment at 2, *Levoff*, (D.N.J. Oct. 24, 2019), ECF No. 16.  Using the confidential

information he learned from his review of those materials, Levoff traded Apple securities ahead of three quarterly earnings announcements in 2015 and 2016 and made approximately $382,000 in combined profits and losses avoided.  *See id.* at 7.  Exacerbating Levoff's conduct was the fact that, in his role, he was responsible for securities laws compliance at Apple, including compliance with insider trading laws.  *See id.* at 2.  As part of his duties, Levoff reviewed and approved the company's insider trading policy and notified employees of their obligations under it regarding quarterly earnings announcements.  *See id.*  After unsuccessfully moving to dismiss the indictment, Levoff ultimately pled guilty and was sentenced to four years of probation.  *See* Judgment at 4, *Levoff*, (D.N.J. Dec. 11, 2023), ECF No. 38.  Not only were Levoff's illicit profits greater than Mr. Costa's, but Levoff's unique role overseeing a Fortune 5 company's securities law compliance enhanced his culpability in a way that Mr. Costa's conduct does not.

As a final attorney example, the former general counsel of SeaWorld Entertainment, Inc., Paul Powers, was sentenced to five years of probation following his guilty plea to insider trading. *See* Judgment at 2, *United States v. Powers*, No. 19-cr-57 (M.D. Fla.), ECF No. 27.  Powers had early access to key revenue information as the company's associate general counsel and assistant secretary, and he purchased 18,000 shares of SeaWorld stock the day after he received a confidential draft of the 2018 second quarter earnings release that detailed a strong financial performance by the company after a lengthy period of decline.  *See* Indictment at 5–8, *Powers*, ECF No. 1.  Powers immediately sold his SeaWorld shares for approximately $65,000 in illicit profits (over $79,000 adjusted for inflation) after the company announced its positive earnings and the company's stock price increased by 17 percent.  *See id.* at 7–8.

And these are hardly the only insider trading defendants to have received noncustodial sentences in cases similar to or objectively more serious than here:

| Case | Description | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Collins*, No. 18-cr-567 (S.D.N.Y.) | Defendant's father, a U.S. Congressman, learned that a clinical trial involving a product being developed by an Australian biotech company had gone poorly. Defendant's father passed that information to defendant, who sold the company's shares before the clinical trial information became public.  Defendant also passed the information to his fiance's father. | $570,900 | Five years of probation (Guidelines range was 37-46 months); $150,000 fine; $100 assessment. |
| *United States v. Anderson*, No. 06-cr-91 (N.D. Ga.) | Defendant, a vice president of a regional bank, learned that the bank's owner was to be acquired by a large, multinational bank. Defendant traded in the owner's stock, and passed on the information to a friend, who also traded in the stock. | $134,999 | Three years of probation (Guidelines range was 18-24 months, and Government sought 18 months imprisonment); $100 assessment. |
| *United States v. Catenacci*, No. 21-cr-759 (N.D. Ill.) | Defendant consulted on a drug trial for a cancer drug, and before the trial's results were publicized, purchased the drug developer's stock.  After the trial results were published, defendant sold the stock. | $134,142 | Time served (one day) and one year of supervised release (Guidelines range was 15-21 months, and Government sought 12 months imprisonment); $200,000 fine. |
| *United States v. Ettu*, No. 18-cr-490 (E.D. Pa.) | Over a two-year period, Defendant bought short and long positions based on material, non-public information obtained from an associate at a global investment bank. | $93,244 | Three years of probation (Guidelines range was 10-16 months); forfeiture of illicit gains; $15,000 fine; $100 assessment. |

In these cases—all of which featured higher loss amounts than Mr. Costa's trading produced—courts declined to sentence defendants convicted of insider trading to custodial sentences, opting instead for probation or time served. Accordingly, sentencing Mr. Costa to prison would create an unwarranted disparity with these defendants.

### III.   PROBATION'S RECOMMENDATION OF A TWO-MONTH PRISON SENTENCE IS UNWARRANTED IN THIS CIRCUMSTANCE

The United States Probation Office ("Probation") recommends that the Court impose a sentence of 2 months imprisonment, which Probation views as a 6-month downward departure under *United States v. Smith* from the bottom end of the 8 to 14-month Guidelines range. *See* ECF No. 38. In *Smith*, the D.C. Circuit held that a downward departure may be appropriate where a defendant's status as a "Deportable Alien"[15] under Bureau of Prisons ("BOP") policy "is likely to cause a fortuitous increase in the severity of the sentence." 27 F.3d 649, 655 (D.C. Cir. 1994). In other words, where a defendant would receive a harsher prison sentence than an otherwise identically situated U.S. citizen because of differences in BOP policies for Deportable Aliens, courts may reduce the term of incarceration to account for the disparity. *See id*. at 651-52.

The correct starting point here, however, is not the bottom end of the advisory Guidelines range. Instead, and in accordance with the recently added Guidelines note that applies to Zero-Point Offenders in Zone B like Mr. Costa, the Court should start from the position that a sentence "other than a sentence of imprisonment" in accordance with the provisions of §5C1.1(c)(3) is "generally appropriate." PSR ¶ 111 (citing § 5C1.1 n.10). As discussed in the PSR, this means that "a sentence of probation that includes a condition or combination of conditions that substitute

---

[15] The BOP defines a "Deportable Alien" as an "inmate who is not a citizen of the United States." *See* BOP Program Statement 5100.08: Inmate Security Designation and Custody Classification (Sept. 12, 2006), *available at* https://www.bop.gov/policy/progstat/5100_008cn.pdf. Under BOP policy, Deportable Alien inmates "shall be housed in at least a Low security level institution." *Id.*

intermittent confinement, community confinement, or home detention for imprisonment" is presumptively "appropriate."  *Id.* ¶ 110; U.S.S.G. § 5C1.1(c)(3).  That more lenient position is the appropriate starting point in determining Mr. Costa's sentence, not the bottom end of the Guidelines range.

Unfortunately, Probation does not provide an explanation for its recommendation that such a sentence is not "appropriate" in this case, and instead that a term of imprisonment is warranted. That is an especially glaring omission here, where Mr. Costa has already spent one week in jail and four months (of the eight recommended by the Guidelines) on home detention while awaiting the resolution of his case.  Moreover, to the extent that Probation is recommending imprisonment because it believes that Mr. Costa is not eligible for a term of probation with conditions of confinement under the BOP's Deportable Alien policy, that is exactly the outcome *Smith* intended to prevent.  Mr. Costa should not receive a prison sentence where an identically situated U.S. citizen defendant would not.

A uniquely similar example in which a district court fashioned a noncustodial sentence to avert such a result is found in *United States v. Simalavong*, 924 F. Supp. 610 (D. Vt. 1995).  There, the district court likewise found that the difference between an incarceratory and a non-incarceratory sentence was "precisely the kind of extraordinary effect" of alienage that cut in favor of a downward departure.  *Id.* at 613.  Like Mr. Costa, the Canadian citizen defendants in *Simalavong* were in Zone B on the Sentencing Table.  *See id.* at 610.  Normally, then, the district court could have "impose[d] a sentence of probation that includes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention."  *Id*.  But due to the BOP's Deportable Alien policy, the defendants were instead facing a prison term.  *See id.* at 612.  Relying on *Smith*, the district court ultimately sentenced the

defendants to probation, concluding that when a non-citizen "would necessarily be given a non-incarceratory sentence in the [c]ourt's discretion, but cannot be afforded one solely because of his or her alien status, this is outside the 'heartland' and warrants a downward departure." *Id.* at 613. Just so here, where it is possible that Mr. Costa's alienage was the sole factor leading Probation to not recommend a noncustodial sentence.

In any event, the Court is not bound by the PSR's recommendation. *See, e.g.*, *United States v. Gallant*, 306 F.3d 1181, 1188 (1st Cir. 2002) (district court may not rely on incorrect legal conclusions in PSR); *United States v. Miller*, 116 F.3d 641, 685 (2d Cir. 1997) (sentencing judge not bound by sentencing recommendations of PSR). The Court should not adopt Probation's sentencing recommendation.

## IV. ADDITIONAL SENTENCING OPTIONS

While Mr. Costa strongly believes that a sentence of time served with a term of suspended supervised release is warranted for the reasons stated above, in the event that the Court is not inclined to order Mr. Costa's recommended sentence, it has additional sentencing options short of imprisonment. First, in accordance with the recent Guidelines Amendment, it could sentence Mr. Costa to a term of probation that includes home detention. It appears that BOP would designate Mr. Costa as a "Deportable Alien," which it defines as an "inmate who is not a citizen of the United States."[16] Inmates with that designation are not generally eligible for community confinement (i.e., a halfway-house).[17] BOP policy, however, states that Probation is responsible for defendants

---

[16] BOP Program Statement 5100.08.

[17] Inmates designated as a "Deportable Alien" "shall not ordinarily participate" in community corrections programs. BOP Program Statement 7310.04: Community Corrections Center (CCC) Utilization and Transfer Procedures, CN-1 (Dec. 16, 1998), *available at* https://www.bop.gov/policy/progstat/7310_004.pdf.

who receive a term of home detention as part of a sentence of probation, not the BOP.[18]  Thus, nothing prevents the Court from sentencing Mr. Costa to a term of probation with home detention to be supervised by Probation.

Second, the Court could sentence Mr. Costa to a term of probation to be served in Brazil. Courts have allowed defendants to serve terms of probation in foreign countries to the extent they are subject to conditions that are readily enforceable.  For example, in *United States v. Gardellini*, the D.C. Circuit affirmed the defendant's sentence of probation to be spent at home with his wife and child in Belgium. *See United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) ("After considering the relevant § 3553(a) factors, the District Court chose not to sentence Gardellini to any prison time.  Instead, the Court imposed […] probation of five years, subject to certain conditions, to be spent in Belgium, where Gardellini resides with his wife and child."); *see also United States v. Saltsman*, Case No. 07-cr-641 (E.D.N.Y. Aug. 10, 2010), ECF No. 163 at 42:6-44:25 (sentencing defendant to probation in Israel subject to agreed supervisory plan between the defendant, government, and probation officer).

Finally, to the extent the Court imposes a sentence of imprisonment, Probation is correct that under those circumstances a downward departure under *Smith* should apply.  Courts in this Circuit routinely give downward departures of six months or more for non-citizen defendants who will be subject to harsher conditions of imprisonment or mandatory deportation following their sentence.  *See, e.g.*, *United States v. Otunyo*, 63 F.4th 948, 954 (D.C. Cir. 2023) (upholding district court's six month "downward departure to account for [defendant's] mandatory post-incarceration

---

[18] "While the [BOP] also provides Community Corrections Center (CCC) services for persons as a condition of probation, parole, or supervised release, only in the most extraordinary circumstances will the Bureau assume responsibility for such persons on home confinement." BOP Program Statement 7320.01: Home Confinement, CN-1 (Aug. 1, 2016), *available at* https://www.bop.gov/policy/progstat/7320_001_CN-1.pdf.

deportation from the United States as a criminal alien"); *United States v. Estrella*, 203 F.3d 53 (D.C. Cir. 1999) (upholding district court's sentence, which included "a six-month downward departure based on his ineligibility, as a deportable alien, for placement in a half-way house"); *United States v. Merise*, 2022 WL 355207, at *2 (D.D.C. Feb. 7, 2022) (applying *Smith* to reduce sentence by six months); *United States v. Stephenson*, 950 F. Supp. 2d 1, 2–3 (D.D.C. 2013) (applying *Smith* to reduce sentence by 42 months from bottom of Guidelines range).

Here, under BOP's "Deportable Alien" policy, Mr. Costa would be required to be housed in at least a Low security level institution—in other words, not a minimum-security prison camp for which he should otherwise qualify as a first-time non-violent offender.[19]   Additionally, he would likely be ineligible for further benefits.  18 U.S.C. § 3624(c), for example, instructs the BOP to ensure to the extent possible that inmates spend the last portions of their sentences under conditions that facilitate their reintegration in the community, such as community confinement or up to ten percent of their term of imprisonment on home detention.  Mr. Costa does not appear to be eligible for either under BOP policy.  Following his prison sentence, Mr. Costa would also be subject to further incarceration as part of his mandatory deportation from the United States.  For all of these reasons, downward departure under *Smith* of at least six months is warranted if the Court imposes a term of incarceration.

V.      **ADDITIONAL SENTENCING PROVISIONS**

The Court should require Mr. Costa to voluntarily depart the United States within seven days of his sentencing.  As part of his plea agreement, the Government agreed to this provision, which states that Mr. Costa agrees "to voluntarily depart the United States no later than either

---

[19]   BOP Program Statement 5100.08 (listing minimum security level for "Deportable Alien" as "Low").

seven days after he is released from imprisonment or seven days after his judgment and sentence are final, whichever is later."  PSR ¶ 9.  Although this provision binds only the U.S. Attorney's Office, and not U.S. immigration authorities, the Court should permit Mr. Costa's voluntary departure and spare U.S. immigration authorities the unnecessary burden of deporting Mr. Costa.

Finally, as Probation recommends, Mr. Costa should not receive a fine.  As part of his plea agreement, he agreed to forfeit more than $42,000 in profits from his conduct, and, as discussed, has been incurring substantial expenses supporting his family in Brazil while living in the United States.  He has also been terminated from his U.S. and Brazilian law firms and, without a visa, is unable to work until he returns home to Brazil.

## VI.    CONCLUSION

For the foregoing reasons, Mr. Costa respectfully requests that the Court order a sentence of time served with a term of supervised release that is suspended upon his voluntary departure from the United States within seven days.

Dated: December 15, 2023

Respectfully Submitted,

By:   */s/ Blake Goebel*

Martin De Luca (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, N.Y. 10001
(212) 446-2300
emdeluca@bsfllp.com

Blake Goebel (D.C. Bar 90011106)
Kenya Davis (D.C. Bar 502305)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, D.C. 20005
(202) 895-5248
kdavis@bsfllp.com
bgoebel@bsfllp.com

*Attorneys for Defendant Romero Cabral da Costa Neto*