UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | No. 23-CR-371 (RJN) |
| : | |
| ROMERO DA COSTA NETO, : | |
| : | |
| : | |
| **Defendant.** : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Now comes the United States of America, by and through the United States Attorney for the District of Columbia, Matthew Graves, and his assistant, Kevin Rosenberg, Assistant United States Attorney for said district and hereby files this sentencing memorandum respectfully requesting a sentence of 8 months of incarceration. This number represents the low end of the total offense level as contemplated by the plea agreement and the pre-sentencing report. The Government's request is supported by the following arguments.

I.     **FACTUAL AND PROCEDURAL BACKGROUND**

Beginning in or around June 2023, Special Agents with the Washington Field Office of the Federal Bureau of Investigation ("FBI") initiated an investigation into the insider trading activities of Defendant Costa ("Costa").

Costa is a Brazilian attorney who was serving in a one-year visiting attorney position with Law Firm-1, working out of their offices in the District of Columbia. Law Firm-1 is a global law firm representing clients around the world in some of the largest corporate mergers and acquisitions occurring on the market. Costa's official work involved Foreign Corrupt Practices Act ("FCPA") matters and at no time was he assigned to work on securities or mergers and acquisitions matters.

Through the investigation, the FBI learned that Costa was accessing privileged and confidential client files on Law Firm-1's internal file management system and systematically performing keyword searches on this database to explore client files in search of valuable material non-public information that he could exploit for financial gain.

### *The Company-A/ Company-B Transaction*

Company-A is a Seattle-based biotech company founded in 1992 that focuses on the acquisition, development, and commercialization for blood-related cancers that offer unique benefits to patients. In June 2023, Company-A was formally acquired in a $1.7 billion deal. Law Firm-1 served as outside counsel for Company-A and representatives of Law Firm-1 were present in all Company-A board meetings discussing the sale.

Negotiations for the sale of Company-A to Company-B began in early April, 2023. The negotiations included a preliminary offer price from Company-B to acquire Company-A. On April 5, 2023, the Company-A Transaction Committee held a meeting by videoconference which was attended by Company A's senior management, and representatives of Company-A's legal counsel at Law Firm-1, and others. The Transaction Committee reviewed the terms of the proposal from Company-B.

In the following weeks Company-A received additional competing offers which proposed alternate transactions. On April 29, 2023, a representative of Company-B informed the President and Chief Executive Officer of Company-A that Company-B intended to submit a final proposal to acquire all of the shares of common stock on May 1, 2023.

On May 2, 2023, Company-B sent the President and Chief Executive Officer of Company-A a revised proposal to purchase all of the shares of Company-A stock for $8.80. Later that day,

2

the Company-A Board held a meeting by videoconference, which included, among others, representatives of Law Firm-1. At the meeting, the Company-A Board instructed management to inform Company-B that Company-A would be willing to enter into a strategic transaction with Company-B for an offer price greater than $9.00 per share.

On May 8, 2023, Company-B told the President and Chief Executive Officer of Company-A that Company-B was prepared to submit a revised proposal to Company-A for greater than $9.00 per share. Later that day, the Company-A Board held a meeting by videoconference, which again included representatives of Law Firm-1, among others. The President and Chief Executive Officer of Company-A updated the Company-A Board regarding the communications from Company-B and Company-A's expected receipt of a revised offer from Company-B.

On May 9, 2023, Company-B sent the President and Chief Executive Officer of Company-A a revised proposal to acquire all of the common stock of Company-A for $9.10 per share. Later that day, the Company-A Board held a meeting by teleconference, which included representatives of Law Firm-1, among others. At the meeting, representatives of their financial advisor firm opined that the latest offer from Company-B was fair to the shareholders from a financial perspective and the Board of Company-A unanimously approved the sale. When the market closed that afternoon of May 9, 2023, shares of Company-A settled at $4.82.

On May 10, 2023, at around 01:00 a.m., Company-A and Company-B each issued press releases announcing the sale and transaction price of $9.10 per share. Following the announcement, shares of Company-A opened for trading on May 10, 2023 at $8.91. They closed at $8.93 on May 10, 2023.

### *Costa Obtained Material Non-Public Information about the Company-A/ Company-B Transaction*

At all times relevant to this investigation, Costa was serving as an attorney for Law Firm-1. Law Firm-1 has an explicit prohibition on insider trading and the use of material non-public information. Costa signed this policy acknowledgement before beginning his employment with Law Firm-1. Relevant to Costa's state of mind, his home country of Brazil also has a prohibition on insider trading.

Law Firm-1 staff working on the transaction – not including Costa – created and stored numerous documents during their representation of Company-A. Between May 3, 2023 and May 9, 2023, Costa accessed and viewed confidential documents on Law Firm-1's system relating to the acquisition of Company-A on over 100 separate occasions. These documents included draft versions of the SEC Form 8-K to announce the sale to Company-B, Board of Director minute trackers from meetings discussing the potential sale, and Transaction Committee minutes. Costa did not have permission nor any legitimate reason to access these documents.

### *Costa Traded Based on Material Non-Public Information*

According to Apex Clearing Corporation ("Apex"), Costa opened account number xxx-07489 with the online trading firm. The account name is Romero Neto. On May 9, 2023, in his Apex account, Costa purchased 5,411 shares of Company-A for a total of $25,998.69.

According to Charles Schwab ("Schwab"), Costa opened account number xxx-59044 with the online trading firm on September 22, 2022. On May 9, 2023 in his Schwab account, Costa purchased 4,989 shares of Company-A for a total of $23,987.42.

Costa's purchases occurred on the day the sale terms were finalized, but before the public announcement was made.

On May 10, 2023, one day after his purchase, and less than 24 hours after the press releases

4

were issued, Costa sold his entire position of 10,400 Company-A shares in his Apex and Schwab accounts for a total of $92,635.24, which resulted in a one-day investment profit of $42,649.13 for Costa. Costa executed these trades based on material non-public information that he accessed without permission by searching privileged and confidential client files on Law Firm-1's document management system.

### *Costa Obtained Material Non-Public Information about Other Transactions*

Costa also obtained material non-public information involving other Law Firm-1 clients during his term of employment – and executed additional prohibited trades based on such information.

Company-C is a company represented by Law Firm-1. On June 2, 2023, Costa purchased stock in Company-C. On June 3, 2023, Company-C announced positive lead-in data from its ongoing Phase 3 PEAK trial evaluating a cancer drug. The stock price rose following this announcement. Costa sold his position in Company-C the following Monday, June 5, 2023. The following day, June 6, 2023, Law Firm-1 issued an opinion related to a secondary stock offering on behalf of Company-C, which had the effect of driving down the value of the stock. In short, Costa was able to purchase Company-C immediately before a positive market event and then quickly sell his stake in Company-C before the subsequent negative market event. Costa profited approximately $1,000 from these transactions.

Costa executed these trades based on material non-public information that he accessed without authorization on Law Firm-1's system. That is, Costa accessed Law Firm-1 files relating to Company-C without authorization on over 170 occasions between May 31, 2023 and June 6, 2023. The documents included drafts of a Clinical Data Form 8-K, draft documents relating to a

stock offering, and draft press releases related to public offerings and pricing. Costa did not have authorization nor any legitimate reason to view these confidential documents, as he was not involved in that matter on behalf of the law firm.

Company-D is another company represented by Law Firm-1. On June 15, 2023, Company-E and Company-D announced a merger in an all-stock deal to create a $5.4 billion oilfield services firm. Between June 8, 2023 and June 12, 2023, Costa purchased approximately 7,000 shares of Company-E in advance of this merger announcement. He subsequently sold these shares and profited approximately $8,500 from these transactions.

Costa again executed these trades based on material non-public information that he accessed on Law Firm-1's system.  That is, between May 9, 2023 and June 12, 2023, Costa accessed and viewed privileged and confidential documents relating to Company-D on Law Firm-1's system on over 200 occasions. The documents included draft merger agreements, merger agreement board presentations, and draft press releases announcing the merger. Costa did not have any legitimate reason to view these documents; he was not involved in that matter on behalf of the law firm.

Costa has acknowledged that he accessed material non-public information related to Company-A, Company-C, and Company-D, and used this information to execute securities trades. Costa acknowledged that he hid his accessing of this information, and use of that information to trade, from Law Firm-1 and Law Firm-1's clients.  Costa used various search terms in Law Firm-1's internal file management database to identify documents that could be exploited for financial gains. Some of the terms used were "8K" and "10k," referring to SEC Form 8k and SEC Form 10k. Other word searches included terms related to mergers and acquisitions. Law Firm-1

discovered numerous unauthorized keyword searches performed by Defendant Costa while he was searching client files looking for valuable non-public information.

## II. LEGAL STANDARD

Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary, to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and to "provide the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a)(2). In addition, the Court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant;" the types of sentences available, the Sentencing Guidelines; any pertinent policy statements; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victims. *Id.* § 3553(a).

## III. GUIDELINES CALCULATION

The Government agrees that the Defendant's offense level, taking into account his acceptance of responsibility, is a level 11. PSR at ¶ 48. The Government further agrees that the Defendant's criminal history category is I. PSR at ¶ 51. The Defendant's applicable guidelines range is therefore 8 to 14 months of incarceration. PSR at ¶109. The Government is recommending the low end of this range.

## IV. ARGUMENT

A sentence of eight months of incarceration, at the low end of the Guidelines range, is appropriate considering the Defendant's egregious conduct and flagrant abuse of his position of trust within the legal profession, simply for a quick financial gain. The Government's

recommended sentence is also designed to deter others, promote respect for the law, and fulfill the other purposes of sentencing.

    1.    **The Nature, Circumstances, and Seriousness of the Offense**

The nature of the offense in question is clearly serious. It is certainly true that Defendant Costa was not executing multi-million-dollar trades, but the dollar amounts involved in the trades are the least egregious aspect of his conduct. Defendant Costa was permitted to enter the United States under a special visa in order to work at the D.C. offices of one of the most prestigious law firms in the world. He was paid a salary of more than $200,000 for his services. He was given access to firm files in order to perform his job and instead he abused that trust by hunting through client files for documents he could exploit. Mr. Costa did not just happen to overhear two attorneys talking in the hallways about a merger or accidentally retrieve an SEC 8K document from the printer, mixed in with his documents. He set out on a mission to find this material through conscious prolific targeted searching of client files. To the extent that acts of insider trading range in severity, the Government submits that this conduct falls at the high end of egregious conduct. The legal profession functions based on trust, the promise of attorney-client privilege, and the duty to confidentiality. Defendant Costa shattered those tenants through his conduct. His profits pale in comparison to his conduct and the Government submits that his conduct warrants a period of incarceration.

    2.    **The Defendant's History and Characteristics**

The Defendant has no prior convictions, and he has received a two-level reduction for being a "Zero-Point Offender." PSR ¶45. Defendant Costa comes from a privileged background and holds significant financial assets totaling over $800,000. PSR ¶97. Many criminal defendants

8

appearing before the Court come from difficult neighborhoods and challenging socioeconomic conditions. Their criminal conduct is driven by their lack of education and employment opportunities. These conditions do not excuse their conduct but certainly contextualize their decision to commit crime. Defendant Costa faced none of those economic conditions. He did not face a lack of education or employment. He held a prestigious position at a global law firm earning a salary higher than 94% of the rest of the country.[1] In summary, Defendant Costa's personal characteristics, education, employment, and family wealth, make his conduct even more egregious.

### 3. The Need to Promote Respect for the Law and Deterrence

Defendant Costa violated the trust of Law Firm-1 as an entity, the trust of the partners and associates who brought him in as a visiting attorney, and the trust of law firm clients who assumed their legal matters could not possibly be exploited for financial gain. A sentence of incarceration promotes respect for the laws prohibiting insider trading. A sentence of incarceration deters the general public from committing these crimes as well. A sentence of probation does not capture the severity of the crime and does not serve to promote respect for the law or deter future offenders.

### V. CONCLUSION

For the foregoing reasons, the Government recommends that the Court impose a sentence of 8 months incarceration.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

By:   *By: /s/ Kevin Rosenberg*
KEVIN L. ROSENBERG
Assistant United States Attorney

---

[1] https://dqydj.com/income-percentile-calculator/

                                District of Columbia
                                OHIO BAR 0081448
                                601 D Street, NW
                                Washington, DC 20530
                                (202) 252-7833
                                KEVIN.ROSENBERG@USDOJ.GOV